IN RE JAMES L.*
(AC 17869)
(AC 18155)

O'Connell, C. J., and Landau and Sullivan, Js.

---

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued June 2—officially released October 19, 1999

*Jennifer E. Davis*, with whom, on the brief, were *Debra Cohen* and *Robert D. Zaslow*, for the appellants (respondents).

*Susan T. Pearlman*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Gregory D'Auria, Benjamin Zivyon* and *Joseph Rubin*, assistant attorneys general, for the appellee (petitioner).

*Eugene P. Falco*, for the minor child.

*Opinion*

LANDAU, J. The respondents appeal from the judgment of the trial court terminating their parental rights

with respect to their son, James L., rendered on a coterminous petition filed by the commissioner of children and families (commissioner).[1] On appeal, the respondents claim that the trial court improperly (1) denied the respondent mother's motion to dismiss the first and second counts of the petition made at the close of the commissioner's case, (2) denied the respondent mother's motion to remove documents attached to the petition, (3) denied the respondents' motions for a new trial and for reconsideration, (4) denied the respondent father's motion seeking disclosure of certain records in the possession of the department of children and families (department) and (5) relied on the respondents' choice to exercise their constitutional right to abort previous pregnancies as a collateral basis for finding that they had abandoned James L. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to these appeals. James L. was born on July 11, 1996, to the respondent parents and lived with them in Torrington. On August 21, 1996, at approximately 7:20 p.m., the respondent mother placed a 911 call to the Torrington police department to report that someone had walked into her apartment and kidnapped her son.[2] The following day, the police found the minor child in a car owned by Carol Brooks.[3] On August 30, 1996, the

[1] The respondent father (AC 17869) and the respondent mother (AC 18155) appealed separately from the judgment of the trial court. The appeals have been consolidated.

[2] Specifically, the respondents' account of the events that transpired that evening indicates that at approximately 7 p.m. they went into the bathroom of their apartment to smoke cigarettes, since neither respondent smoked in the presence of the minor child. Before doing so, the respondent mother placed the baby on a bed. After approximately five minutes, the respondents returned from the bathroom and found that the minor child was missing.

[3] Brooks was intimately involved with Jerry Petrovits, the respondents' landlord to whom they owed eighteen months of rent, and was indebted to him for bonding her out of jail. At trial, she admitted to conspiring with Petrovits to sell the minor child. Contrary to the respondents' account of the events that transpired that day, Brooks testified that the respondent

trial court granted a request by the commissioner for an order of temporary custody, and the commissioner thereafter filed a coterminous petition alleging that James L. was an abandoned child and seeking termination of parental rights.

The trial court found, by clear and convincing evidence, that the respondents had abandoned the minor child in violation of General Statutes (Rev. to 1995) § 46b-120 (i), as amended by Public Acts 1995, No. 95-225, § 9, and General Statutes (Rev. to 1995) § 17a-112 (b) (1), and engaged in specific acts of parental omission and commission in violation of § 17a-112 (b) (3).[4] The court found that "placing the child in commerce and delivering the child to Carol Brooks constituted the act of abandoning the child, an act of commission." It concluded that "[t]he callousness and the circumstances surrounding his sale [in exchange] for rent ensure that [James L.] will face [additional] painful awareness of the meaning of being an 'unwanted' and 'abandoned' child."[5] The court found that these grounds for termination did not exist for more than one year preceding the filing of the petition but nevertheless waived the one year statutory requirement to promote the best interests of the child. The court, finding that it was in the best interests of the minor child to do so, granted the petition and terminated the respondents'

father, with the acquiescence of the respondent mother, delivered the minor child to Brooks to watch for a short period while Petrovits effectuated a sale of the minor child.

[4] During the trial, the court dismissed a third allegation against the respondent father of no ongoing parent-child relationship.

[5] In 294, the Roman Emperor Diocletian stated that "it was 'an evident principle of law' that parents could not sell, pawn, or give away their own offspring. nor could children be forced into servitude to pay their parents' debts." J. Boswell, The Kindness of Strangers: The Abandonment of Children in Western Europe From Late Antiquity to the Renaissance (1988), p. 67. The selling of a freeborn child by the father—mothers probably never had the right to enslave their children—was not a change of guardianship, but of personhood. Id.

parental rights. From that judgment, the present appeal ensued. Additional facts and procedural history will be discussed where relevant to issues in this appeal.

I

Initially, the respondent mother claims that the trial court improperly failed to grant her motion to dismiss. We disagree.

Following the commissioner's presentation of her case-in-chief, the respondent mother asked the court to dismiss the first and second counts of the petition, which alleged abandonment and acts of omission or commission, respectively, on the ground that the commissioner had failed to make out a prima facie case. After the court denied the motion, the respondents presented their case, and, "[a]y, there's the rub."[6]

In her brief and at oral argument, the commissioner relied on the "waiver rule." "Under this rule, when a trial court denies a defendant's motion for a directed verdict at the close of the plaintiff's case, the defendant, by opting to introduce evidence in his or her own behalf, waives the right to appeal the trial court's ruling. See *Dindo* v. *Grand Union Co.*, 331 F.2d 138, 141 (2d Cir. 1964); *State* v. *Rutan*, 194 Conn. 438, 440, 479 A.2d 1209 (1984). The rationale for this rule is that, by introducing evidence, the defendant undertakes a risk that the testimony of defense witnesses will fill an evidentiary gap in the [plaintiff's] case. *State* v. *Rutan*, supra, 440. On appeal in such cases, the question becomes whether . . . there is evidence in *the entire record* to justify submitting the matter to a trier of fact. . . . *Warner* v. *Kewanee Machinery & Conveyor Co.*, 411 F.2d 1060, 1063 (6th Cir. 1969), cert. denied, 398 U.S. 906, 90 S. Ct. 1685, 26 L. Ed. 2d 65 (1970); see also 9 J. Wigmore, Evidence (4th Ed. 1981) § 2496, pp. 402–403. Although

---

[6] William Shakespeare, Hamlet, act 3, sc. ii, line 59.

we have questioned the continuing viability of the waiver rule in the criminal context; see *State* v. *Rutan*, supra, 441; we have never questioned its applicability in the civil context. Id." (Emphasis in original; internal quotation marks omitted.) *Sears, Roebuck & Co.* v. *Board of Tax Review*, 241 Conn. 749, 756–57, 699 A.2d 81 (1997).

The respondents have articulated no persuasive reason why the rationale underlying the waiver rule should not operate in this case.[7] We conclude, therefore, that the waiver rule precludes our review of the respondents' first claim.

II

In their second claim, the respondents assert that the trial court improperly denied the respondent mother's motion to remove documents attached to the petition. We disagree.

Further review of the trial court's factual findings and the procedural posture of this case is necessary for our analysis of this claim. The respondents argued to the trial court that attached to the petition were eleven police reports, four documents claiming to be certified voluntary statements and an unidentified and unsigned typed copy of a letter allegedly written by the respondent mother to the respondent father. The respondents claim that the inclusion of those documents "could impair the trial court's impartiality," "could taint future motions and proceedings" and "impeded the respondents' rights to cross-examine upon and challenge the documents when submitted at trial."

Further, the respondents argue that the inclusion of the documents violated Practice Book § 10-1, formerly

---

[7] We note, moreover, that counsel for the respondents conceded at oral argument before this court that the waiver rule applied because she offered evidence at trial.

§ 108, § 32-1, formerly § 1040.1 (1) and (2), and § 32-2, formerly § 1040.1 (3) and (4). Specifically, the respondents argue that § 10-1 "excludes the attachment of supporting evidence from pleadings," and that §§ 32-1 and 32-2 limit attachments to a petition to "statutory references reflecting the specific conditions which resulted in the subject of the petition, a summary of facts and a summons." This claim, however, lacks merit. While there is no quarrel that § 10-1[8] states that the recitation of evidence is not appropriate in a pleading, it clearly does not exclude the attachment of exhibits. In fact, Practice Book § 10-29 (a), formerly § 141, provides in relevant part that "[a]ny plaintiff desiring to make a copy of any document a part of the complaint may, without reciting it or annexing it, refer to it as Exhibit A, B, C, etc., as fully as if it had been set out at length; but in such case the plaintiff shall . . . file the original or a copy of such exhibit . . . in court . . . ." If the respondents' assertion is correct, it would make a nullity of § 10-29 (a).

Our conclusion finds support in those rules of practice governing procedure in juvenile matters in the family division of the Superior Court. Practice Book § 32-6, formerly § 1041.1 (1), requires the commissioner to provide supporting documents when seeking orders of temporary custody. See *Pamela B.* v. *Ment*, 244 Conn. 296, 302–303, 709 A.2d 1089 (1998). Moreover, General Statutes § 46b-129 (b) requires that the commissioner

---

[8] Practice Book § 10-1, formerly § 108, provides: "Each pleading shall contain a plain and concise statement of the material facts on which the pleader relies, but not of the evidence by which they are to be proved, such statement to be divided into paragraphs numbered consecutively, each containing as nearly as may be a separate allegation. If any such pleading does not fully disclose the ground of claim or defense, the judicial authority may order a fuller and more particular statement; and, if in the opinion of the judicial authority the pleadings do not sufficiently define the issues in dispute, it may direct the parties to prepare other issues, and such issues shall, if the parties differ, be settled by the judicial authority."

file, in addition to the petition, verified affirmations of facts when seeking an order of temporary custody. Most of the challenged documents here were notarized, and the record demonstrates that the commissioner filed these documents to support an order of temporary custody.

The respondents' further argue that "the [rules of practice do] not authorize attachment of numerous police reports with hearsay statements, alleged witness statements and other miscellaneous documents to petitions for the initiation of the judicial process in juvenile matters." This contention, however, is further undermined by the fact that many of the challenged documents were admitted at trial. Moreover, virtually all the information in the documents was contained in the department's social study and addendum to the social study, both of which were admitted as exhibits at trial.

The respondents have advanced absolutely no evidence to justify their contention that the trial court was "no longer impartial" as a result of having in its possession the challenged documents. It is axiomatic that the trial court is able to hear the testimony and to rely on only competent evidence in reaching its determination. Accordingly, we are satisfied, from our review of the record, that the trial court properly denied the motion to remove the documents from the petition.[9]

---

[9] At the hearing on the order of temporary custody, the respondents never objected to the documents attached to the petition. Even if the documents had been improperly attached to the petition, they were properly attached to the application for temporary custody and would have been available to the court. Moreover, even if we were to assume impropriety, without so finding, the respondents have failed to point to any harm or prejudice. *State* v. *Berger*, 249 Conn. 218, 230, 733 A.2d 156 (1999) (evidentiary rulings will be overturned on appeal only where trial court abused its discretion and substantial prejudice or injustice is shown).

The respondent mother acknowledges that she has the burden to point to a specific harm under *In re Soncheray H.*, 42 Conn. App. 664, 666, 680 A.2d 1363, cert. denied, 239 Conn. 940, 684 A.2d 712 (1996). In their brief, however, the respondents state that the "[respondent mother] does not challenge a specific evidentiary ruling by the trial court." At oral argument

## III

In their third claim, as part of their amended appeal, the respondents maintain that the trial court improperly denied their motion for a new trial[10] and their motion to reconsider that denial. We disagree.

Nine months after the trial court's ruling terminating the respondents' parental rights, they asserted that newly discovered evidence necessitated a new trial. Specifically, the respondents claim that because during the criminal trial Brooks recanted the testimony that she gave in the termination proceeding,[11] her testimony

before this court, counsel stated that they "[could not] point to a specific harm" and that there is no way to determine the harm.

[10] The respondents filed a pleading titled "Respondent-Parents' Petition for a New Trial." We note that a petition for a new trial is not the equivalent of a motion for a new trial. *State* v. *Goodwin,* 3 Conn. Cir. Ct. 386, 388, 215 A.2d 913, cert. denied, 153 Conn. 725, 213 A.2d 525 (1965). A petition for a new trial, under General Statutes § 52-270, although ancillary to the original trial, is a new proceeding terminating in a judgment from which an appeal may be taken. *State* v. *Myers,* 242 Conn. 125, 135, 698 A.2d 823 (1997). A motion for a new trial, pursuant to Practice Book § 16-35, is made within the confines of the docketed matter. See *Cadle Co.* v. *Ginsburg,* 51 Conn. App. 392, 408–409 n.5, 721 A.2d 1246 (1998), cert. denied, 247 Conn. 963, 724 A.2d 1125 (1999).

Initially, we must determine whether the document at issue is a motion or a petition for a new trial. The respondents filed a petition for a new trial, dated August 28, 1998, on September 21, 1998, and an identical motion for a new trial, also dated August 28, 1998, on August 31, 1998. The trial court's memorandum of decision stated that the respondents filed the petition on August 28, 1998, and thereafter made reference to it as a "motion." The respondents, in their brief to this court, state that they "petitioned the trial court for a new trial," but proceed to cite to the motion for a new trial. Moreover, a review of the transcripts reveals that all parties considered the filing as a motion for a new trial, and the trial court heard the matter as a motion for a new trial. We will do likewise. See *Doe* v. *Marselle,* 38 Conn. App. 360, 363–64, 660 A.2d 871 (1995), rev'd on other grounds, 236 Conn. 845, 675 A.2d 835 (1996); *Crozier* v. *Zaboori,* 14 Conn. App. 457, 463, 541 A.2d 531 (1988).

[11] On or about August 23, 1996, the state charged the respondent father with risk of injury to a child in violation of General Statutes § 53-21 (1), conspiracy to commit risk of injury to a child in violation of General Statutes a §§ 53a-48 (a) and 53-21 (1), intentionally making a false statement in violation of General Statutes § 53a-157b (a), falsely reporting an incident in

could not be relied on and, therefore, the case against the respondents in the termination case was suspect at best. Accordingly, the respondents claim that a new trial is warranted.

"[O]ur standard of review of the trial court's denial of a motion for a new trial is limited to a determination of whether, by such denial, the court abused its discretion. *State* v. *Rothenberg*, 195 Conn. 253, 264, 487 A.2d 545 (1985). *State* v. *Leavitt*, 8 Conn. App. 517, 524, 513 A.2d 744, cert. denied, 201 Conn. 810, 516 A.2d 886 (1986). As a reviewing court considering the trial court's decision granting or denying a motion for a new trial, we must be mindful of the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided." (Internal quotation marks omitted.) *Munson* v. *United Technologies Corp.*, 28 Conn. App. 184, 194–95, 609 A.2d 1066 (1992).

Moreover, "[a] party is entitled to a new trial on the ground of newly discovered evidence if such evidence is, in fact, newly discovered, will be material to the issue on a new trial, could not have been discovered and produced, on the trial which was had, by the exercise of due diligence, is not merely cumulative and is likely to produce a different result. . . . New trials are not granted upon newly discovered evidence which discredits a witness unless the evidence is so vital to the issues and so strong and convincing that a new trial would probably produce a different result. . . . The basic question which the trial court has to decide is whether upon all the evidence an injustice had been done. In deciding this question, the court has the exercise of a sound legal discretion, and its action cannot be disturbed unless this discretion has been abused." (Cita-

violation of General Statutes § 53a-180 (a) and abandonment of a child under the age of six years in violation of General Statutes § 53-23. The respondent mother was charged with conspiracy to commit risk of injury to a child and falsely reporting an incident. They were acquitted on those charges.

tions omitted.) *Turner* v. *Scanlon*, 146 Conn. 149, 163, 148 A.2d 334 (1959).

The respondents postulate that Brooks' admission at the criminal trial of the misstatements that she had made before the juvenile court in the termination hearing demonstrated new evidence that they could not have discovered as a result of due diligence. The respondents' argument, however, is somewhat disingenuous in that Brooks' admission was the result of the vigorous investigation and cross-examination of her by the respondents' own defense counsel.[12] This alleged new evidence could have been discovered before the trial by the same means and by the same diligence as it was discovered after the trial. The failure to discover the evidence before trial constitutes a lack of due diligence. See *Malaspina* v. *Itts*, 3 Conn. Cir. Ct. 651, 655, 223 A.2d 54 (1966); see also *Hartford-Connecticut Trust Co.* v. *Putnam Phalanx*, 138 Conn. 695, 699, 88 A.2d 393 (1952); *Williams* v. *Commissioner of Correction*, 41 Conn. App. 515, 528–29, 677 A.2d 1 (1996), appeal dismissed, 240 Conn. 547, 692 A.2d 1231 (1997).

The information that Brooks, in the criminal trial, admitted perjury, standing alone does not support a conclusion that it would produce a different result in a new termination proceeding. Moreover, the respondents did not offer any evidence that Brooks' testimony before the juvenile trial court was falsified. The court found: "The respondents have failed to demonstrate anything by a preponderance of the evidence since they offered no evidence whatsoever. For that reason alone, their motions should be denied." The court further found that, "Carol Brooks did not appear in [this court]

---

[12] The respondents also claim that they were frustrated in their efforts because they were denied access to the department's records. See part IV of this opinion. There is no indication that these records were made available to the respondents' criminal defense counsel, which leads one to conclude that their criminal defense counsel was able to uncover information that led to Brooks' impeachment without the department's records.

flying under false colors. The trial court was aware that [Brooks] had pending criminal charges against her . . . . She had a history of drug addiction, of obtaining controlled substances by fraud, that her own child had been removed from her by the [department] and that she had given several different stories to the police . . . that were at extreme variance to her testimony in court. She was not presented to the court as a tabernacle of virtue and veracity. Indeed, she was presented as a person with a great deal of personal emotional baggage. *Nonetheless, this court found her testimony plausible, consistent and supported by the independent testimony of numerous other witnesses and other documentary evidence.* The respondents' account of how their child was taken from them while the two of them huddled for five minutes in the bathroom for a cigarette break is so implausible as to invite disbelief." (Emphasis added.) "When you have excluded the impossible, whatever remains, however improbable, must be the truth."[13]

Here, the respondents offered no evidence and made little effort to obtain the alleged newly discovered evidence. While the newly discovered evidence does tend to discredit Brooks' testimony, we are persuaded that the trial court properly concluded that the alleged new evidence would not have led to a different result. We conclude, therefore, that the respondents have failed to meet their burden to show that the trial court abused its discretion.

## IV

The respondent father next claims that the trial court improperly denied him access to records concerning Brooks that were in the department's possession. Specifically, he claims that the department introduced Brooks' "propensity for child abuse and/or child neglect" into the case in the first count of the revised

[13] A. Doyle, The Adventure of the Beryl Coronet, in Complete Adventures and Memoirs of Sherlock Holmes (Bramhall House 1975), p. 154.

petition, which states that "[t]he parents surrendered their son to a woman who is a convicted felon and substance abuse addict without any regard for the child's safety. . . . Brooks' biological child had previously been removed from her care and custody because of her inability [safely to parent the child]."

At the time the motion for disclosure of records was considered, the respondent father claimed that "this case is all about Brooks' lack of credibility," and that there was a "concern as to credibility and reliability, particularly [Brooks'] ability to comprehend, know and correctly relate the truth of the [facts] that she asserts." In his motion, the respondent father argued that by virtue of rights accorded him under the federal and state constitutions, he should be given the records to enable him to prepare properly his defense and "confront his [accuser]." Finally, he stated that information that demonstrates an accuser's inability to perceive and relate information correctly is exculpatory. On appeal, he claims that inasmuch as the revised petition appears to rely on information contained in these confidential records, any privilege, whether it is asserted on behalf of Brooks or on the department's own behalf, must fall.

It is axiomatic that a party cannot submit a case to the trial court on one theory and then seek a reversal in the reviewing court on another. A party is not entitled to raise issues on appeal that have not been raised in the trial court.[14] "[B]ecause our review is limited to

___

[14] Even if we were to review this claim, we would conclude that it lacks merit. General Statutes § 17a-28 permits court-ordered disclosure only when a parent, child or legal representative of either has been denied access to personal records. While such confidentiality may not be unconditional; *State* v. *Kulmac*, 230 Conn. 43, 57, 644 A.2d 887 (1994); even a defendant in a criminal case is not entitled to absolute access to department files, but can request access only if the court, after an in-camera review, determines that the file contains exculpatory data. See id., 58–59; *State* v. *Storlazzi*, 191 Conn. 453, 459, 464 A.2d 829 (1983); see also *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 60, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987). We have recognized the state's compelling interest, as well as statutory basis, for maintaining both mental health and substance abuse records. See *State* v. *Storlazzi*, supra,

matters in the record, we will not address issues not decided by the trial court. Practice Book § 4185 [now § 60-5] ('court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial'); *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 444 n.10, 685 A.2d 670 (1996) (claims 'neither addressed nor decided' by court below are not properly before appellate tribunal); *State* v. *Miller*, 186 Conn. 654, 658, 443 A.2d 906 (1982) ('[o]nly in the most exceptional circumstances will this court consider even a constitutional claim not properly raised and decided in the trial court')." *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 52, 717 A.2d 77 (1998). We decline, therefore, to review this issue.

V

Finally, the respondents claim that the trial court improperly considered their choice to exercise their constitutional right to abort previous pregnancies as a collateral basis for finding abandonment. This claim, however, is proffered for the first time on appeal. Nowhere in the transcript of any proceeding or in any pleading do we find any indication, even remotely, that the court's alleged consideration of the respondents' prior family planning decisions implicated the respondent mother's right under *Roe* v. *Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973).

Appellate courts "shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. . . ." Practice Book § 60-5; see *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 52. Although the respondents have a fundamental constitutional right to retain their parent-child relationship, and this right

458; General Statutes §§ 52-146c, 52-146d; see also 42 U.S.C. § 290dd-2; 42 C.F.R. § 2.1 et seq.

can be severed only in strict compliance with statutory standards; *In re Baby Girl B.*, 224 Conn. 263, 279–81, 618 A.2d 1 (1992); appellate courts have regularly observed that § 60-5 "applies to constitutional claims." (Internal quotation marks omitted.) *In re Romance M.*, 229 Conn. 345, 352, 641 A.2d 378 (1994). Only in the most exceptional circumstances will an appellate court consider such a claim. *Berry* v. *Loiseau*, 223 Conn. 786, 828–29, 614 A.2d 414 (1992); see *In re Michael A.*, 47 Conn. App. 105, 110–11, 703 A.2d 1146 (1997). The respondents have pointed to no such exceptional circumstances in the present case. Accordingly, we decline to review the merits of this claim.

The judgment is affirmed.

In this opinion the other judges concurred.