******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

IN RE KYARA H. ET AL.*
(AC 35573)

Beach, Keller and Pellegrino, Js.

*Argued October 21, 2013—officially released January 16, 2014***

(Appeal from Superior Court, judicial district of Windham, Juvenile Matters at Willimantic, Hon. Francis J. Foley III, judge trial referee.)

*James P. Sexton*, assigned counsel, for the appellant (respondent mother).

*Susan T. Pearlman*, assistant attorney general, with whom were *Benjamin Zivyon*, assistant attorney general, and, on the brief, *George Jepsen*, attorney general, and *Michael J. Besso*, assistant attorney general, for the appellee (petitioner).

*Raymond F. Parlato*, for the minor children.

*Opinion*

KELLER, J. The respondent mother, Andrea K., has appealed to this court from the judgments of the trial court, *Hon. Francis J. Foley III*, judge trial referee, terminating her parental rights in her minor children, Kyara H., born in 2004, Jahein H., born in 2004, Trevon M., born in 2009, and Kahlil M., born in 2011. The respondent claims that, in light of the fact that the children have obvious and complex psychological issues, the court committed reversible error by failing, sua sponte, to order a psychological evaluation of the children for purposes of determining whether termination of the respondent's parental rights was in their respective best interests. We affirm the judgments of the trial court.

On July 25, 2012, the petitioner, the Commissioner of Children and Families (commissioner) filed petitions to terminate the parental rights of the respondent and Tyrone H. in their children, Kyara and Jahein.[1] On that same date, the commissioner filed petitions to terminate the parental rights of the respondent and Jose M. in their children Trevon and Kahlil.[2] In each petition, the commissioner asserted that "[t]he child has been found in a prior proceeding to have been neglected and uncared for and [the respondent and the male biological parent of the child] has . . . failed to achieve the degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the age and needs of the child . . . they . . . could assume a responsible position in the life of the child . . . ." See General Statutes § 17a-112 (j) (3) (B) (i).

The court conducted a trial on the petitions, after which it rendered a thorough memorandum of decision that set forth its findings and conclusions. In the adjudicative phase of the proceeding, the court found in relevant part: "[The respondent] is presently twenty-eight years old. She was raised in Hartford and moved to Eastern Connecticut after she dropped out of school in the ninth grade. Her father was an active alcoholic; her mother was addicted to cocaine. She was sexually abused by her brother when she was twelve. She reports a strong relationship with her father who remains an active alcoholic. [The respondent] frequently left her children in the care of her father throughout the years.

"At eighteen years old, [the respondent] was arrested by the Putnam police for resisting arrest. She was convicted and received a nine month suspended sentence and [one] year probation. . . .

"[The respondent] met Tyrone when she was nineteen and soon got pregnant. Kyara was born on January 22, 2004. The child tested positive for the presence of marijuana; [the respondent] admitted usage throughout her pregnancy. A continuing theme. [The respondent] transferred guardianship of Kyara to her father, Leander [K.], where the child remained for the first three years

of her life.

"[The respondent] gave birth to her second child, Jahein, on November 13, of the same year, 2004. Jahein also tested positive for marijuana. Two months later, on January 26, 2005, Tyrone was arrested for assault upon [the respondent] and was later convicted and sentenced to one year in jail, suspended with three years probation. He later violated the probation and was incarcerated. [The respondent] said that Tyrone left her shortly after this episode and since then he does not acknowledge his children in any way . . . 'he ignores his children.'

"From May 6, 2005, until the spring of 2006, neither of the children were with [the respondent]. Kyara was with [Leander K.] and Jahein was removed from [the respondent's] care by [the commissioner] after [the respondent] was found several miles from her home extremely intoxicated by alcohol while Jahein was with her. She lost her balance and fell while holding him and he hit his head. She was arrested and charged with risk of injury to a minor and disorderly conduct. [The Department of Children and Families (department)] offered services and [the respondent] was also required to [complete] court ordered treatment programs. Upon successful completion, the charges were reduced to disorderly conduct and she received an unconditional discharge from the criminal court on October 6, 2005, and Jahein was returned to her care.

"In the summer of 2008, [the respondent] met an undocumented man from Brazil, who was fifteen years her senior, Jose. Jose was, and remains, a functionally illiterate person in that he can neither read nor write in any language. Thus began a four year domestically violent, substance abusing relationship that produced three more children.

"On March 26, 2009, [the commissioner] sought and obtained temporary custody of Kyara and Jahein due again to [their] exposure to illegal substances, domestic violence and inadequate supervision. This was the second removal by [the commissioner]. Again, [the department] offered services to [the respondent] and also to Jose to address these issues. [The respondent] was pregnant again. Both [the respondent] and Jose participated in services resulting in the return of the two children, Kyara and Jahein, in October, 2009, under an order of protective supervision effective until April, 2010.

"In November, 2009, [the respondent] was again arrested, her third arrest, for disorderly conduct. She was fined $200. Apparently this arrest escaped the notice of [the department]. The following month, December 31, 2009, Trevon was born.

"On April 11, 2011, Kahlil was born. The child tested positive for marijuana. [The respondent] acknowledged

to [the department] that she used marijuana and alcohol throughout her pregnancy. She admitted mutual domestic violence with Jose. She said she uses marijuana daily and that she drinks two or three times per week and will drink two or three forty ounce bottles of beer and a few shots.

"[The respondent] reports that she and Jose also smoked K-2, a synthetic drug chemically similar to marijuana. This drug can be four to a hundred times more potent than marijuana and is popular with marijuana users since it does not show up on drug screens unless used within the preceding two hours of testing. It can produce hallucinations, severe agitation, panic attacks, dangerously elevated heart rate and blood pressure and, seizures . . . ." (Citations omitted.)

In describing the circumstances surrounding the removal of the children from the care of the respondent, the court found in relevant part as follows: "Petitioner's Exhibit B, an affidavit of a [department] social worker, describes an horrific and chaotic home life for [the respondent], Jose, the children and [the respondent's] alcoholic father, Leander. The picture described is the daily use of marijuana by both parents, [the respondent] frequently drinking alcohol to the point of intoxication; her father drinking daily with his friends to intoxication and occasional domestic violence between Jose and [the respondent]. The [affidavit] describes events between August, 2010, and October 13, 2011, when [the commissioner] finally obtained an order of temporary custody."

The court referred to a police report that described an incident that occurred on August 26, 2010, in which Jose struck the respondent in the kitchen of their residence, in the presence of Kyara, Jahein, and Trevon. The respondent told one of the police officers responding to this domestic disturbance that she was having difficulty coping with the recent suicide of her brother. She stated that, upon her return from a package store, she got into a disagreement with Jose and that he struck her using his hand as well as a roll of masking tape, and then dragged her down onto the floor. Subsequently, Jose was arrested and charged with disorderly conduct, assault in the third degree, and risk of injury to minor children. The criminal charges were dismissed following Jose's completion of a family violence education program.

The court found: "In April, 2011, upon the birth of Kahlil, born positive for marijuana, [the commissioner] filed a petition alleging neglect but did not seek removal of the children. [The department] again offered services to both parents through [the] Stonington Institute, Community Prevention and Addiction substance abuse evaluation and treatment, New Perceptions counseling, individual counseling for [the respondent] with [counselor] Cam Morin-Bounds and others. . . .

"[O]n September 6, 2011, after Jose was arrested and held in jail [on] motor vehicle charges, [a department] social worker learned that [the respondent] had reported that seven year old Kyara was [engaging in inappropriate sexual conduct with her] then six year old brother, Jahein. [The respondent] was receiving services from a Community Resources, Inc. (CRI) behaviorist and clinician. The clinician told [the department] that [the respondent] says that Kyara roams the house in the middle of the night, urinating in her room and that [the respondent] fears leaving Kyara and Jahein alone together."

The court went on to discuss a police report concerning an incident on October 1, 2011. During the incident, the respondent was taken into custody incident to a traffic stop. The respondent acted in a physically and verbally combative manner toward the police. Additionally, she vomited in a police cruiser and shouted profanity at the police. Upon her arrival at the police station, the respondent continued to act in a combative manner and disregarded police commands that she undergo processing calmly. The respondent was charged with violations of motor vehicle laws, interfering with an officer, and breach of peace.

The court went on to find: "On October 12, 2011, a [department] social worker observed [twenty-two] month old Trevon with two black eyes. According to [the respondent] and her father, Leander, Trevon fell on a piece of furniture. The next day, Jose and a friend went to [the respondent's] home. They report that [the respondent] had been drinking beer when they arrived. They said that [the respondent] continued to drink throughout the afternoon and evening, [having stolen vodka and wine from another person]. The report [submitted as an exhibit] indicates that Jose and [the respondent] then went to [a motel] with [twenty-two] month old Trevon and [six] month old Kahlil. During the time at the motel, Jose reports that [the respondent] was so drunk that she dropped Kahlil twice, [and] left the hotel to start walking on Route 6 wearing no shoes and having unzipped pants. Jose called the police and [the respondent] was subsequently arrested for breach of peace and resisting arrest.

"Both Jose and [the respondent] reported to the social worker that Jose had been unfaithful to [the respondent] with a neighbor and that this infidelity had caused further strife in their relationship. Jose admitted it was poor judgment to go to the hotel with [the respondent] while she was intoxicated and angry over his infidelity. Two days later, [the commissioner] sought and obtained an order of temporary custody of the children."[3]

The court observed that specific steps were entered for all parties on October 14, 2011, at the time of the

initial order of temporary custody, and later, on February 1, 2012. With regard to the respondent, the court found: "It must be recalled that [the department] began offering services to [the respondent] in 2004. The children had been previously removed on two occasions. Within the past two years and prior to the most recent third removal of the children, [the department] had engaged CRI for intensive family preservation services for [the respondent] and the children. This was a program designed to keep the family together and provided needed services for the family. In May, 2011, [the department] engaged a Family Based Recovery program for [the respondent] and the children. [The respondent] met with these providers nine times while they were attempting to help her. [The respondent] consistently tested positive for marijuana during those services. She quit the program [on] June 24, 2011, and began a day treatment program for substance abuse. She did not complete the program.

"After her arrest on October 1, 2011, and after the children were removed on October 14, 2011, she entered Stonington Institute Partial [H]ospitalization and Intensive Outpatient treatment on October 25. She completed the program for the second or third time and was released on December 6, 2011. Jose was there to pick her up. Jose and [the respondent] said they were going to resume living together at [the respondent's] apartment . . . . [The respondent] was supposed to attend [Alcoholics Anonymous (AA)] meetings. She did not. There is evidence that she and Jose were using illegal drugs, marijuana and K-2, and/or drinking alcohol at least through the end of April and into the beginning of May, 2012, more than six months after the children were removed.

"In February, 2012, she resumed her individual counseling with Cam Morin-Bounds, a licensed alcohol and drug counselor. This counselor testified that she has been treating [the respondent] off and on for more than [seven] years. She knows that [the respondent] is an alcoholic. She describes alcoholism as a disease with strong genetic predisposition. She appears very forgiving of [the respondent], describing many episodes of relapse over the years. She said that [the respondent] began AA meetings in 2011, but that is inconsistent with other evidence including self-reports. She testified that [the respondent] has been making improvements. She seemed pleased with [the respondent's] progress in her personal rehabilitation. She testified that she last saw [the respondent] in March, 2012. [The respondent] stopped attending counseling with her after one month of visits; she began in February and ended in March.

"[The respondent] entered a residential substance abuse program known as New Life on March 20, 2012. She told the intake worker that she had been using drugs while in her last program, she reported drinking

alcohol every three days. Cam Morin-Bounds did not report that [the respondent] was drinking in February. [The respondent] stayed in this program until she was discharged on April 30, 2012, after she was found to have K-2 in her room.

"[The department] found another program for her. On May 1, 2012, [the respondent] was scheduled to enter Mother's Retreat in Groton, a program that works with [a] substance abusing [woman] and if successful allows [her] children to be reunited with her in treatment. [The respondent] failed to attend the intake session. On May 22, 2012, [the respondent] entered yet another program known as Fresh Start in Hartford.

"[The respondent] had failed to remain sober even after a multitude of detoxification and impatient programs through eight years of various programs. Her children have been removed three times from her care.[4] (Footnotes altered.) On July 25, 2012, [the commissioner] filed [petitions] to terminate her parental rights." The court went on to find that the children had been found in a prior proceeding to have been neglected and that the respondent had failed to achieve such degree of personal rehabilitation that would encourage the belief that within a reasonable time, considering the ages and needs of the children, she could assume a responsible position in the life of the children. In this appeal, the respondent does not challenge the court's finding that she has failed to achieve personal rehabilitation.

In the dispositional phase of the proceeding, the court addressed and considered the seven factors specified in § 17a-112 (k). Additionally, the court considered the best interests of the children, concluding: "Clear and convincing evidence establishes that it is in the children's best interest to grant the petition and terminate the parental rights of the biological parents. Thus, in consideration of all the factors relevant here to the children's needs and best interest[s], it was proven by clear and convincing evidence that terminating the parental rights is in the children's best interests."[5] See General Statutes § 17a-112 (j) (2). This appeal followed.

The respondent claims that the guarantee of procedural due process under the United States constitution required the court, sua sponte, to order a psychological evaluation of the children for the purpose of determining whether termination of the respondent's parental rights was in their best interests. The respondent asserts that "this case presents the type of complex psychological issues that required the trial court to order psychological evaluations prior to making any determination as to the children's best interests." The respondent argues in relevant part: "[D]espite the obvious potential for these issues to impact the dispositional outcomes that might best advance their respective needs, the trial court, [*Hon. Francis J. Foley III*, judge trial referee],

never ordered a psychological evaluation before concluding that terminating the respondent's parental rights was uniformly in the best interest of all four children. . . . [B]ecause the failure to order a psychological evaluation in this case created an unacceptably high risk of the court unnecessarily terminating the fundamental liberty interests of both the respondent and her children when it may well not be necessary to do so, the court ran afoul of the respondent's due process rights." Underlying the respondent's novel claim is her supposition that trial courts lack formal training in medicine and psychology and, in cases such as the present, are not competent to engage in a best interest analysis without relying on expert opinion concerning multiple child attachment theories and their application in each case.[6]

Our review of the record reflects, and the respondent acknowledges, that this issue of procedural due process was not raised before the trial court. Although deeming it necessary to a proper resolution of the case, the respondent did not ask the court to order a psychological evaluation of her children.[7] In her principal appellate brief, the respondent affirmatively requests extraordinary review pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original; footnote omitted.) Id. "The first two prongs of *Golding* address the reviewability of the claim, and the last two involve the merits of the claim." *State* v. *Brown*, 56 Conn. App. 26, 31, 741 A.2d 321 (1999), cert. denied, 252 Conn. 927, 746 A.2d 790 (2000).

## I

As a preliminary matter, the respondent's resort to *Golding* review is unavailing because the record belies the factual premise of the claim. In *Golding*, our Supreme Court stated that "[t]he defendant bears the responsibility for providing a record that is adequate for review of his claim of constitutional error. If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, we will not attempt to supplement or recon-

struct the record, or to make factual determinations, in order to decide the defendant's claim." *State* v. *Golding*, supra, 213 Conn. 240.

The respondent has premised her invocation of *Golding* on the existence of "complex" and "obvious" psychological issues related to Kyara, Jahein, Trevon, and Kahlil. To prevail under *Golding*, therefore, the record must reflect that such issues exist with respect to each of the respondent's children. In support of her claim that the "psychological issues" of the children required that the court, sua sponte, order a psychological evaluation, the respondent refers to several matters in evidence. First, she refers to "inappropriate sexual acts" between Kyara and Jahein. In its decision, the court referred to a department social worker's report, which included the *respondent's* observation that, while living with the respondent, Kyara was engaging in inappropriate sexual behavior with Jahein. The court observed, as well, the respondent's representation that Kyara "roams the house in the middle of the night" and "urinates in her room." This behavior was not corroborated by any other source. A July 24, 2012 social study prepared by a department social worker,[8] submitted in support of the petitions, states that, since her placement in a foster home, Kyara "has not displayed any sexualized behaviors" and has adjusted well in her foster home. At school, she performs at grade level and does not have any behavioral problems.

Second, the respondent refers to "Attention Deficit Hyperactivity Disorder." In the department social worker's report, it states that an "art therapist" who has been working with Kyara reported that she was "very loud" and "clumsy." The therapist reported that "she could have Attention Deficient Hyperactive Disorder or these could be symptoms of other things." There is no evidence that any diagnosis by a medical professional was made in this regard. Additionally, in the department social worker's report, it refers to Jahein's history of "Attention Deficient Hyperactive Disorder." The report goes on to state that, at this time, the group of evaluators[9] that had studied his case determined that *this issue need not be addressed*. Although the respondent reported difficulties with Jahein's behavior in the home, including his tendency to spend time alone, the report states that Jahein "has made a lot of progress since being placed in the foster home," he "has been doing excellent in school," his teacher "is very happy with him and his progress . . . and enjoys having him in his class," and that he has been "doing better with his hygiene . . . showering . . . and brushing his teeth."

Third, with regard to the other two children, Trevon and Kahlil, the respondent acknowledges in her brief that "[they] do not appear to have the same psychological issues at this time, but both are deemed 'medically complex' by the [commissioner]." In this regard, the

respondent goes on to state that "[b]oth children have asthma, requiring nebulizer treatments, and Kahlil has Hepatitis C, which can be a life-threatening disease." Additionally, the respondent relies on evidence that Trevon experienced some regression in his potty training after being placed in foster care.

The department social worker's report submitted in evidence states that "Trevon presents as a happy and easy going toddler. Once he warms up he is easily engaged and smiles often." Initially after being placed with his foster family, Trevon had a "flat affect" and had difficulty sleeping through the night. Those problems have disappeared and he is engaging in activities that are developmentally appropriate for his age. Further, "Birth to Three made an assessment of Trevon and deemed that he did not qualify for their services."[10] The department social worker's report states that upon joining his foster home Kahlil "is a happy baby who smiles and babbles often. There are not any concerns regarding Kahlil's developmental milestones. He is crawling and almost walking by himself. [He] was evaluated by Birth to Three services and they reported that he does not meet the qualifications for services."

In a purely subjective manner, the respondent has labeled certain conduct, medical conditions and diagnoses as "complex" and "obvious psychological issues." She has not demonstrated, by reference to findings of fact or competent evidence, that any of these things constitute obvious psychological issues that were of such a complex nature that they should have triggered the court, sua sponte, to order a psychological evaluation. The respondent has not established a necessary factual predicate in support of her claimed entitlement to review under *Golding* because there is no finding or evidence that at the time that the court rendered its decision, any of the four children at issue suffered from obvious and complex psychological issues.[11] The respondent effectively conceded that there are *medical* issues involving Trevon and Kahlil; she has failed to demonstrate by reference to competent evidence that they are *psychological* issues that should affect a best interest analysis. With respect to Kyara, the respondent relies on her own observation of sexual conduct and other activities, yet there is no evidence of any diagnosis of any psychological disorder by a medical professional, let alone findings by the court that such issues existed. To the contrary, the evidence demonstrates that Kyara was performing well apart from the respondent. Finally, with respect to Jahein, the respondent points to his historical diagnosis with a psychological issue, namely, Attention Deficient Hyperactive Disorder. The evidence, which was credited by the court, unambiguously reflects that this disorder was not an area of concern at this time for the department social workers who studied Jahein. Rather, he, like all of his siblings, had been making excellent progress in almost all areas after

being distanced from the respondent and entering foster care. Absent a sufficient showing in the record that obvious and complex psychological issues existed, the factual predicate for the respondent's claim is lacking. See *In re Amanda A.*, 58 Conn. App. 451, 458, 755 A.2d 243 (2000) (claim of constitutional error not reviewable where record insufficient to substantiate factual basis of claim).

## II

In part I of this opinion, we concluded that the factual predicate underlying the respondent's claim, which is of constitutional magnitude, was not apparent in the record. Even were we to conclude that the record supported the factual premise of the claim—or the claim was based on the facts apparent in the record—the respondent's *Golding* claim is unavailing because she is unable to demonstrate that due process required the court, sua sponte, to order a psychological evaluation of the children for purposes of determining whether termination of her parental rights was in their respective best interests.

"In reviewing a procedural due process claim, we must first determine whether a protected liberty or property interest is involved. If it is, then we must determine the nature and extent of the process due." (Internal quotation marks omitted.) *In re Tayler F.*, 296 Conn. 524, 553, 995 A.2d 611 (2010). The present appeal arises from the termination of the respondent's parental rights and, as this court has recognized, "[t]he right of a parent to raise his or her children has been recognized as a basic constitutional right." (Internal quotation marks omitted.) *In re Tremaine C.*, 117 Conn. App. 521, 529, 980 A.2d 317, cert. denied, 294 Conn. 920, 984 A.2d 69 (2009).[12]

Whether the process due the respondent required the court, sua sponte, to order a psychological evaluation of her children, is governed by the balancing test set forth by the United States Supreme Court in *Mathews* v. *Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). See *In re Alison M.*, 127 Conn. App. 197, 219–20, 15 A.3d 194 (2011) (*Mathews* balancing test applies in context of proceeding to terminate parental rights). "Under this test, [t]he three factors to be considered are (1) the private interest that will be affected by the state action, (2) the risk of an erroneous deprivation of such interest, given the existing procedures, and the value of any additional or alternate procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens attendant to increased or substitute procedural requirements. . . . Due process analysis requires balancing the government's interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures." (Internal quotation marks omitted.) *Barros* v. *Barros*, 309 Conn. 499, 509, 72 A.3d 367 (2013).

The first factor of the *Mathews* balancing test, concerning the private interest at stake, weighs in the respondent's favor. "A petition to terminate parental rights threatens the respondent's constitutionally protected interest [in retaining her parental rights in her children]." *In re Tremaine C.*, supra, 117 Conn. App. 530.

The second factor, consideration of the efficacy of current procedural safeguards and the efficacy of any additional or alternate procedural safeguards, does not weigh in the respondent's factor. As discussed previously in this opinion, the respondent argues, essentially, that courts commonly do not rely on appropriate psychological theories when undertaking best interest analyses, that courts are ill-equipped to evaluate the myriad of proper considerations that are relevant to a best interest analysis, and that proper best interest analyses should be influenced by child psychology that favors continued contact between children and biological parents. The respondent argues that, given the facts of the present case, the court was obligated sua sponte to order a psychological evaluation of the children because "the trial court [had] no reliable assessment of how well bonded the children were to their foster parents or what type of damage would be occasioned by terminating parental rights at this time. . . . Absent that type of information, there is a significant risk that the trial court rendered a decision that unnecessarily destroyed this family or was affirmatively detrimental to the children, and that is a risk that due process forbids in light of the easy access to psychological evaluations that are so commonly used in these types of cases."

An evaluation of current procedural safeguards reflects that the respondent's parental rights were terminated following numerous court proceedings and a lengthy trial, during which the respondent was represented by counsel. Current procedural safeguards include the court's statutory authority, exercised whether on motion by a party or on its own initiative, to order a psychological evaluation of a child that is the subject of a termination of parental rights proceeding. General Statutes § 45a-717.[13] The record reflects that the respondent did not raise such a motion in the present proceeding and the respondent has not suggested that the court precluded her from doing so.[14] The respondent's argument is premised on an assumption, the support for which is uncertain, that the outcome of a psychological examination in the present case would have weighed in her favor. That is, the respondent merely speculates that an expert would have formulated an opinion that did not weigh in favor of the termination of her parental rights. In no manner does the respondent address the issue of why she failed to attempt to present such a favorable alternative theory before the trial

court. In argument, she alludes to evidence of an ongoing bond with her two oldest children, Kyara and Jahein, and suggests that the court was unaware of contemporary research noting "the importance of continued contact between children and their biological parents . . . ."[15] Yet, "[o]ur courts consistently have held that even when there is a finding of a bond between parent and a child, it still may be in the child's best interest to terminate parental rights." *In re Rachel J.*, 97 Conn. App. 748, 761, 905 A.2d 1271, cert. denied, 280 Conn. 941, 912 A.2d 476 (2006). Certainly, apart from any issues related to the existence of a bond between the respondent and any or all of her biological offspring, the court was free to rely instead on the evidence that it amply discussed in its thorough memorandum of decision regarding the many ways in which the respondent has failed to behave as a responsible parent or to provide any semblance of a stable and safe home environment for the children at issue. See, e.g., *In re Devon W.*, 124 Conn. App. 631, 649, 6 A.3d 100 (2010).

Furthermore, our courts have consistently eschewed the notion that judges lack the ability to weigh the evidence and make correct best interests determinations in termination of parental rights cases. As our state's highest court has observed: "Although we often consider the testimony of mental health experts . . . such expert testimony is not a precondition of the court's own factual judgment as to the child's best interest." (Citations omitted; internal quotation marks omitted.) *In re Jeisean M.*, 270 Conn. 382, 398, 852 A.2d 643 (2004); see also *In re Teshea D.*, 9 Conn. App. 490, 493, 519 A.2d 1232 (1987) (same). Thus, the respondent's claim, itself, is based on an assessment of the capability of the trial court that is without support in our case law.

Here, the respondent urges us to conclude that an added procedural safeguard, namely, a psychological evaluation of the children ordered, sua sponte, by the court, was part of the process that was due in the present case. The respondent had the right to move the court to order such an evaluation but did not exercise such right. Moreover, the respondent, in a purely speculative manner, suggests that such an evaluation would have yielded expert opinion, based on psychological theories of which, she supposes, the court was unaware, that would have stressed the importance of maintaining a bond between the respondent and, perhaps, some of her children. The court, however, in undertaking a proper analysis that focused on the totality of the material considerations relevant to a best interest analysis, would not be bound by such expert opinion or by the nature of the bond between the respondent and any of her children.[16] After considering the existing procedures, we are not persuaded by any of the respondent's arguments that they are not adequate or that alternate procedural safeguards would have eliminated the risk of an erroneous deprivation of the respondent's private

interest in parenting her children.

Finally, we consider the state's interest in the procedures used, including the fiscal and administrative burdens attendant to any additional or substitute procedures advocated by the respondent. There can be no dispute that the type of expert psychological evaluation advocated by the respondent entails a significant financial cost, one that would be borne by the petitioner. See General Statutes § 45a-717 (d), set forth in footnote 15 of this opinion. As our Supreme Court has observed, "the state has a fiscal and administrative interest in *lessening the cost* involved in termination proceedings." (Emphasis added.) *In re Alexander V.*, 223 Conn. 557, 565, 613 A.2d 780 (1992). The respondent posits that "such due process concerns would not be implicated in every termination case" and that "it is unlikely there would be many cases where due process required an evaluation where the court did not use its discretion to order such an evaluation." Although the respondent urges us to recognize that such a constitutionally warranted procedural safeguard applies to cases, similar to the present cases, in which the court is presented with evidence that one or more children have obvious and complex psychological issues, this class of cases is ill-defined and, thus, potentially large. Indeed, were we to accept as accurate the respondent's central premise, that a psychological evaluation is a precondition to the court undertaking a best interest analysis in the present cases, which do not present obvious or complex psychological issues, it certainly would not be hard to envision that such an evaluation would be necessary in the vast majority of termination cases.

Apart from the financial burden attendant to the added procedural safeguard at issue comes the delay that would be occasioned by such a safeguard. The respondent argues that "there is no indication that requiring courts to use psychological evaluations would delay permanency for children." Our Supreme Court has observed: "[A]s parens patriae, the state is . . . interested in the accurate and speedy resolution of termination litigation in order to promote the welfare of the affected child. . . . [B]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . . . Any significant delay would undermine the state's important interest in protecting the welfare of children. This cost, and the state's interest in avoiding it, would rise as the delay increased." (Citation omitted; internal quotation marks omitted.) *In re Alexander V.*, supra, 223 Conn. 565. The state's interest in expediting termination proceedings would be adversely affected by any delay necessitated by the ordering of psychological evaluations of children in termination of parental rights cases, especially after the trial has commenced.

Having considered the *Mathews* factors, we are not persuaded that due process required the court, sua sponte, to order a psychological evaluation in the present cases. The respondent's interest in parenting her biological offspring is significant, yet she has not demonstrated that the process afforded her in the present case risked an erroneous deprivation of that interest. Current procedural safeguards afford the respondent a mechanism to seek a psychological evaluation and afford the court, in its discretion, a means of obtaining such an evaluation. Furthermore, the respondent has not demonstrated that, even if she presented the results of such an evaluation in the present cases, it likely would have affected the outcome of the trial and, thus, that it would have eliminated the risk of an erroneous deprivation of the right at issue. Finally, both in terms of cost and delay, the consequences of the added safeguard weigh against its recognition.

In light of the foregoing analysis, we conclude that the respondent is unable to demonstrate that a constitutional violation clearly exists and clearly deprived her of a fair trial. See *State* v. *Golding*, supra, 213 Conn. 240. Accordingly, we cannot conclude that the court erred in terminating the respondent's parental rights with respect to her minor children.

The judgments are affirmed.

In this opinion the other judges concurred.

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79a-12, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

** January 16, 2014, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] The respondent father, Tyrone H., has brought a separate appeal from the trial court's judgment terminating his parental rights in Kyara and Jahein. See *In re Kyara H.*, 147 Conn. App. , A.3d (2013). We refer in this opinion to the respondent mother as the respondent.

[2] The court terminated Jose's parental rights in Trevon and Kahlil. Jose is not a party to this appeal. The court found that the respondent and Jose also had another child in 2012, who, as of the time of trial, was in the care of one of the respondent's relatives. That child is not a subject of the present appeal.

[3] There was evidence that, in addition to being removed from the respondent's home on two separate occasions pursuant to the commissioner's motions for orders of temporary custody, Kyara and Jahein, with the acquiescence of the department, were voluntarily placed with a paternal uncle after the department reopened their cases due to domestic violence occurring between the respondent and Jose in February, 2009. This arrangement only lasted about one month and the uncle returned the children to the respondent without notifying the department. The department learned that the children were back in the respondent's care when Jahein told school staff that he played with a gun and bullets at her home.

[4] Despite these findings and the additional finding that eight year old Kyara spent the first three years of her life in the care of her grandfather, none of which are in dispute, the respondent incredibly asserts in argument before this court that she has been "[the] only constant in [Kyara's] life."

[5] "This court has noted consistently the importance of permanency in children's lives. . . . Virtually all experts, from many different professional disciplines, agree that children need and benefit from continuous, stable home environments. . . .

"[S]table and continuous care givers are important to normal child devel-

opment. Children need secure and uninterrupted emotional relationships with the adults who are responsible for their care." (Citations omitted; internal quotation marks omitted.) *In re Davonta V.*, 285 Conn. 483, 494–95, 940 A.2d 733 (2008).

[6] The respondent does not merely assert that the court was obligated to order a psychological evaluation, but that in a case involving "complex psychological issues," such as the present case, it is necessary that the court consider "multiple psychological theories" and not merely the "the very psychological theories most commonly relied upon by trial courts" in undertaking a best interest analysis. Presumably, this then would require multiple evaluations from a variety of experts espousing competing theories. In the case of indigent parents, as here, the state would bear this cost. See Practice Book § 34a-21 (f). Absent from the respondent's brief is any explanation as to how the judicial authority, which the respondent believes to be untrained and incompetent in evaluating such matters in the field of psychology, would resolve the issue of which theory is correct.

[7] The record reflects that, before the trial court, the respondent argued that the evidence was insufficient to demonstrate that termination was in the children's best interest because the court did not have before it a psychological evaluation of the children in support of such a conclusion. The commissioner argues that because the respondent's litigation strategy before the trial court was to rely on the lack of a psychological evaluation as a means of challenging the sufficiency of the evidence, she is precluded on appeal from seeking review under *State* v. *Golding*, supra, 213 Conn. 239–40, on the ground that it was the responsibility of the trial court to order such an evaluation. The commissioner's argument is based on the principle that to permit review would sanction an ambush of the trial court and is based on the principle of appellate review that "a party cannot submit a case to the trial court on one theory and then seek a reversal in the reviewing court on another." *In re James L.*, 55 Conn. App. 336, 348, 738 A.2d 749, cert. denied, 252 Conn. 907, 743 A.2d 618 (1999).

Although the respondent did not request that the court order a psychological evaluation of the children, we are not persuaded that her arguments before the court related to the lack of a psychological report necessarily are inconsistent with her appellate claim that it was the obligation of the court to ensure that such an evaluation was part of the evidence before it. Contrary to the commissioner's arguments, this is not a situation in which the respondent took a position at trial that was contrary to the claim raised on appeal, such as by indicating before the trial court that a psychological evaluation was unnecessary in this case or that it would have been inappropriate for the court sua sponte to order one.

[8] The report was prepared by department social worker Shannon Bienkowski, who the court found "has had sufficient formal education and experience in the behavioral sciences to express an expert opinion as a social worker on such matters." At trial, Bienkowski testified that she held a bachelor's degree in human development as well as a master's degree in social work. Bienkowski testified that, at the time of trial, she had eleven years of professional experience in social work, which encompassed five years as a department employee, and six years as an employee of a psychiatric hospital, where, among other things, she was a clinician for their pediatric intensive outpatient and partial hospitalization programs.

[9] The report states that the respondent was referred to CRI, which worked with Jahein on a biweekly basis and continues to work with Jahein and his foster family to assist with behavioral issues.

[10] "The Birth to Three program offers early childhood intervention services for children under three years of age that show significant delays in development." *In re Keyashia C.*, 120 Conn. App. 452, 456 n.10, 991 A.2d 1113, cert. denied, 297 Conn. 909, 995 A.2d 637 (2010).

[11] Thus, the present case is somewhat analogous to *In re Azareon Y.*, 309 Conn. 626, 636–39, 72 A.3d 1074 (2013) (concluding that review under *Golding* inappropriate where factual predicate underlying substantive due process claim not supported by record). We note that the respondent's procedural due process claim is not merely grounded in a certain process applicable in all cases, in which case the proof of its application would establish the alleged constitutional violation, but in the application of a process that was defective given the circumstances of the present case *in which, she alleges, the respondent's children were affected by obvious psychological issues that were relevant to the trial court's best interest analysis.*

[12] The commissioner argues that the respondent's claim does not satisfy

*Golding*'s second prong because, following the outcome of the adjudicatory phase of the proceeding, the respondent did not have a *fundamental* interest in the dispositional phase of the proceeding, the subject of which was the best interest of her children. In support of this proposition, the commissioner relies primarily on the analysis of the United States Supreme Court in *Santosky* v. *Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). The language relied on by the commissioner states: "At the factfinding, the State cannot presume that a child and his parents are adversaries. After the State has established parental unfitness at that initial [adjudicative] proceeding, the court may assume at the *dispositional* stage that the interests of the child and the natural parents do diverge. See Fam. Ct. Act § 631 (judge shall make his order 'solely on the basis of the best interests of the child,' and thus has no obligation to consider the natural parents' rights in selecting dispositional alternatives). But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." (Emphasis in original.) Id., 760.

We do not share the commissioner's interpretation of *Santosky*, which does not find support in our case law. In our view, the subject language does not stand for the proposition that, following an adverse determination in the adjudicative phase, a biological parent lacks a fundamental interest in the outcome of the dispositional phase of the proceeding. Rather, the language at issue appears to emphasize that the sole consideration in the dispositional phase of the proceeding is the best interest of the child and not the natural rights of the biological parent. As our Supreme Court has observed: "Under § 17a-112, a hearing on a petition to terminate parental rights consists of two phases: the adjudicatory phase and the dispositional phase. During the adjudicatory phase, the trial court must determine whether one or more of the . . . grounds for termination of parental rights set forth in § 17a-112 [(j) (3)] exists by clear and convincing evidence. The commissioner . . . in petitioning to terminate those rights, must allege and prove one or more of the statutory grounds. In contrast to custody proceedings, in which the best interests of the child are always the paramount consideration and in fact usually dictate the outcome, in termination proceedings the statutory criteria must be met before termination can be accomplished and adoption proceedings begun. . . . Section [17a-112 (j) (3)] carefully sets out . . . [the] situations that, in the judgment of the legislature, constitute countervailing interests sufficiently powerful to justify the termination of parental rights in the absence of consent. . . . Because a respondent's fundamental right to parent his or her child is at stake, [t]he statutory criteria must be strictly complied with before termination can be accomplished and adoption proceedings begun." (Citation omitted; footnote omitted; internal quotation marks omitted.) *In re Elvin G.*, 310 Conn. 485, 500–501, 78 A.3d 797 (2013).

[13] General Statutes § 45a-717 (d) provides in relevant part: "Upon finding at the hearing or any any time during the pendency of the petition that reasonable cause exists to warrant an examination, the court, on its own motion or on motion by any party, may order the child to be examined at a suitable place by a physician, psychiatrist or licensed clinical psychologist appointed by the court. The court may also order examination of a parent or custodian whose competency or ability to care for a child before the court is at issue. The expenses of any examination if ordered by the court on its own motion shall be paid for by the petitioner or, if ordered on motion by a party, shall be paid for by the party moving for such an examination unless such party or petitioner is unable to pay such expenses in which case, they shall be paid for by funds appropriated to the Judicial Department . . . . The court may consider the results of the examination in ruling on the merits of the petition."

[14] The language of § 45a-717 (d), specifically the legislature's use of the word "may," reflects that the statute calls on the court to exercise its sound discretion in ordering examination on its own initiative or on motion by a party. See *In re Cynthia A.*, 8 Conn. App. 656, 663, 514 A.2d 360 (1986) (interpreting legislature's use of "may" in General Statutes § 17-38a). In an analogous context, related to the denial of a request for independent psychiatric evaluations of respondents, this court observed, "[t]he trial court's decision whether to order a psychological evaluation in a termination of parental rights proceeding will not be disturbed unless that judicial discretion was clearly abused." *In re Daniel C.*, 63 Conn. App. 339, 365, 776 A.2d 487 (2001); see also *In re David E.*, 4 Conn. App. 653, 658, 496 A.2d 229 (1985) (same).

[15] As discussed previously in this opinion; see footnote 8 of this opinion; the respondent emphasizes a reliance not merely on psychological evaluation, but psychological evaluation of a type favored by her, namely, that which focuses on and relies heavily on certain relevant psychological theories related to continued contact, bonding and attachment between parent and child.

[16] A careful review of the court's thorough memorandum of decision belies any argument that the court was unconcerned with the children's connection to the respondent or to the feelings of attachment experienced by the children. In evaluating § 17a-112 (k) (4), the court noted the fact that the guardian ad litem reported that Kyara and Jahein expressed "[an] understandable wish to be reunited with their mother." The court went on to observe that the respondent's younger children were bonded with their foster parents. Further, in discussing the best interests of the children, the court stated: "The court has also balanced the children's intrinsic need for stability and permanency against the potential benefit of maintaining a connection with the biological parents, especially the mother." The court found that none of the children had expressed an interest in living with Jose.